# JUDGE SWAIN

**'09 CIV 9697**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
NOV 20 2009
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| DOW CORNING CORPORATION, HEMLOCK SEMICONDUCTOR CORPORATION and DEVONSHIRE UNDERWRITERS LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> MERRILL LYNCH & CO., INC. and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT**

**Civ. No.**

**JURY TRIAL DEMANDED**

Dow Corning Corporation, Hemlock Semiconductor Corporation and Devonshire Underwriters Limited (collectively "Plaintiffs"), by and through their attorneys, Boies, Schiller & Flexner LLP, as and for their Complaint against Defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Defendants") allege as follows:

## PRELIMINARY STATEMENT

1.    This action arises out of Defendants' false statements and material omissions made in connection with Defendants' sale of auction rate securities ("ARS") to Plaintiffs about the safety and liquidity of ARS and the ARS market at a time when Defendants were artificially supporting and manipulating the ARS market to maintain the appearance of liquidity while they knew the market was illiquid and collapsing.  Plaintiffs

did not know, and could not know, the facts that Defendants knew and Defendants actively concealed those facts from Plaintiffs and other of Defendants' customers.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1332 and 1337, 15 U.S.C. § 78aa and has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.  The matter in controversy exceeds $75,000.

3.      Venue is proper in this District under 18 U.S.C. § 1391(b) because the Defendants reside and may be found in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District and under 15 U.S.C. § 78aa because Defendants transact business in this District..

## PARTIES

4.      Plaintiff Dow Corning Corporation ("Dow Corning") is a Michigan corporation with its principal place of business in Midland, Michigan.  Dow Corning is a leading global supplier of silicones.

5.      Plaintiff Hemlock Semiconductor Corporation ("Hemlock") is a Michigan corporation with its principal place of business in Hemlock, Michigan.  Hemlock is a producer of polysilicon.

6.      Plaintiff Devonshire Underwriters Limited ("Devonshire") is a District of Columbia corporation with its principal place of business in Washington, D.C. Devonshire is an insurance company.

7.      Defendant Merrill Lynch & Co., Inc. is incorporated in Delaware and its principal executive offices are in New York, New York.  Merrill Lynch & Co., Inc., now wholly-owned by Bank of America Corporation, is a global financial services firm.

8.      Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is incorporated in Delaware and its principal executive offices are in New York, New York. Merrill Lynch, Pierce, Fenner & Smith Inc., a wholly-owned subsidiary of Merrill Lynch & Co., Inc., is registered with the SEC as a banker-dealer under Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange and the Financial Industry Regulatory Authority.

## FACTS

**Plaintiffs' Investment Objectives**

9.      Like many companies, Dow Corning must manage its cash and current assets. Dow Corning also manages certain cash and current assets of Hemlock and of Devonshire.

10.     Plaintiffs manage their cash and current assets according to investment policies and objectives that require Plaintiffs to preserve capital, maintain liquidity and obtain a reasonable rate subject to limited risk.

11.     Maintaining liquidity is critical to Plaintiffs' objectives. Accordingly, for all the funds that were invested with Defendants, Plaintiffs only sought to purchase high-quality, low risk investments that had high, investment-grade ratings.

12.     From at least 2005, Plaintiffs engaged Defendants to provide investment and cash management services to them.

13.     In connection with that engagement, Plaintiffs told Defendants about their investment policies, requirements and objectives. At all relevant times, Defendants were fully aware of these investment policies, requests and objectives.

14.    Under that engagement, from some time prior to 2005 and until February 13, 2008, Defendants sold ARS to Plaintiffs.

**Defendants' Role In ARS Investments**

15.    ARS are long-term bonds issued by municipalities, student loan entities or pass through trusts which hold securities, all with variable interest rates or dividend yields that are periodically reset through a bidding process known as a Dutch auction.

16.    In the Dutch auction process, bids with successively higher rates are accepted until all of the securities in the auction are sold.  The auctions typically occur every 7, 14, 28 or 35 days.

17.    If there are not enough bids to buy the ARS for sale, a "failed auction" results, and ARS holders have to continue to hold their ARS rather than sell it.  When an ARS auction fails, the holder cannot sell the investment until at least the next auction date, and potentially for an indefinite period, because there is no established, secondary market for the ARS.

18.    Issuers of ARS select one or more broker-dealers to underwrite the offering and/or manage the auction process.  Defendants were one of the largest underwriters in the ARS market.  They also served as managing broker-dealer for many ARS.  When acting as the sole manager, Defendants were the only firms that could submit bids into the auction on behalf of their clients and/or other broker dealers who wanted to buy and/or sell any auction rate securities.  When acting as lead manager, Defendants were the primary firms that could submit bids into the auction, while other broker-dealers were able to submit orders on behalf of their clients as well.

19.    Defendants received, and continue to receive, substantial fees for underwriting and managing the auctions.

20.    Before an auction took place, broker-dealers surveyed investor interest and gave guidance to potential investors, providing a range of rates within which the broker-dealers believed the auction would clear.  This guidance was called "price talk."

21.    Price talk enabled broker-dealers to influence the clearing rate for the auctions they managed because it allowed broker-dealers to consider whether investors were placing bids above the price talk and whether the broker-dealer would submit supporting bids to ensure that an auction cleared at a lower rate.

22.    ARS are also subject to maximum rate restrictions, which set an absolute ceiling on the dividend or interest rate, and allow ARS to achieve high quality, investment-grade AAA ratings.

23.    Because the maximum rate places an absolute cap on the interest or dividend the instrument will pay, in turn lessening the issuer's potential obligations, lower maximum rates make is easier for ARS to obtain AAA ratings.

24.    Defendants used the AAA rating as an important marketing tool when describing the nature and safety of the ARS offered to Plaintiffs.

**Defendants' Misrepresentations and Manipulations of ARS**

25.    Defendants marketed ARS to Plaintiffs as highly-liquid, highly-rated and secure investments that were equivalent to cash.  Defendants touted the safety and liquidity of ARS by stating that ARS auctions rarely failed.  Defendants were aware that their customers, particularly corporate customers such as Plaintiffs, purchased ARS for these very reasons.

26.     In January 2007, in Chicago, Illinois, Gary Vartabedian, of Defendants' Global Institutional Advisory Division, made a presentation to Heather Szafranski, of Dow Corning's Global Treasury Department about ARS.  As part of that presentation, Mr. Vartabedian represented that ARS's were safe, highly-liquid investments of high investment grade securities.  He represented that ARS auctions rarely fail.

27.     Since Plaintiffs started purchasing ARS from Defendants and throughout 2007 and until February 13, 2008, initially Thomas Byrne and later Gary Vartabedian, both of Defendants' Global Institutional Advisory Division, always submitted a bid on Plaintiffs' behalf to purchase ARS at the auctions.  In other words, Defendants always submitted either a "buy" or "sell" or "hold at rate" bid in every auction in which Plaintiffs participated.

28.     Throughout the period of the engagement and until February 13, 2008, Plaintiffs relied on Defendants' knowledge, skill, judgment and expertise in purchasing ARS recommended to them by Defendants.

29.     Plaintiffs relied on Byrne's and Vartabedian's advice, expertise and recommendations of ARS when purchasing ARS.  Defendants did not provide Plaintiffs with a prospectus for each ARS they purchased.

30.     In addition, by virtue of their position as underwriters and auction managers, Defendants had knowledge of the conditions of the ARS auction market that Plaintiffs did not, and could not, have.  Plaintiffs relied on Byrne's and Vartabedian's advice as to the conditions of the ARS market.

31.     Based on Defendants' assurances of liquidity, high ratings and low-risk, and Defendants' superior knowledge, skill, judgment and expertise regarding ARS,

Plaintiffs purchased a total of approximately one hundred sixty-six million dollars ($166,000,000) of ARS from Defendants that Plaintiffs cannot liquidate.

32.     Defendants' representations of ARS's liquidity and risk were untrue statements of material fact.

33.     ARS were not highly liquid, highly rated and secure investments. They were, in fact, different from cash alternatives or cash equivalents. In the event of failed auctions, a risk that increased dramatically starting in Fall 2007, investors cannot sell their auction rate securities, except at steep discount.

34.     Defendants misrepresented the risk that the auctions would fail and failed to disclose the fact that the ARS market was artificially sustained by the continued bidding and purchasing by Defendants and other broker-dealers and that the cessation of their bidding and purchasing practices would immediately render all ARS illiquid.

35.     Defendants submitted support bids when there was insufficient demand in an auction. Yet, investors like Plaintiffs were not told and could not determine if auctions were clearing because of normal market demand or because Defendants were artificially sustaining the market through support bids. Defendants never told investors like Plaintiffs that the liquidity of the ARS auctions that Defendants managed depended on Defendants' continued use of support bids. While Defendants knew the true measure of supply and demand, as opposed to the illusory market created by Defendants, they did not disclose these facts to Plaintiffs. There was no way for investors like Plaintiffs to monitor the true supply and demand in the market or to assess when broker-dealers might decide to stop supporting the market thereby causing its collapse.

36.     Defendants supported the ARS auctions for various reasons, including but not limited to: (1) to earn commissions on the sale of ARS to its customers; (2) to earn fees from underwriting ARS issuances; (3) to maintain favorable business relationships with the issuers of ARS; (4) to maintain favorable business relationships with large institutional investors that invested in ARS; and (5) to gain time to dispose of Defendants' own inventory of ARS by selling them to unsuspecting clients such as Plaintiffs.

37.     Starting in the Fall of 2007, the Defendants knew there were increased risks of failures in the credit markets.

38.     At that time, Defendants continued to market ARS to Plaintiffs as safe, liquid securities and assured investors like Plaintiffs of their commitment to the ARS markets.

39.     Defendants knew and should have known that the ARS markets were in fact deteriorating and that ARS were not safe, liquid investments.

40.     From the Fall of 2007 through February 2008, Defendants increased their support bids to provide the false impression that the demand for auction rate securities had not decreased.

41.     From the Fall of 2007 through February 2008, Defendants increased their own inventory of ARS.

42.     Upon information and belief, Defendants were aware that other broker-dealers were also increasing their own inventories of ARS during that same time period.

43.     Between the Fall of 2007 and February 2008, Defendants were aware of the increasing risk of a widespread failure of the ARS market.

44.     Throughout 2007 and until February 13, 2008, Defendants contacted Plaintiffs on a daily basis to provide Plaintiffs with information about their ARS and the ARS market, including price talk and information about upcoming auctions and new issuances.

45.     During those communications, Defendants never disclosed to Plaintiffs these increasing risks of owning or purchasing ARS.

46.     During those conversations, Defendants assured Plaintiffs that their ARS investments were safe, highly liquid, high investment-grade investments.

47.     Indeed, in late 2007, Ms. Szafranski called Gary Vartabedian to ask why interest rates on ARS were increasing.  She was told by Mr. Vartabedian that it was because of problems with mortgage-backed securities issuances and that those issues did not affect the liquidity or safety of the high-grade ARS held by Plaintiffs.  Defendants knew those representations were false.

48.     In late October 2007, Ms. Szafranski met with Mr. Vartabedian at Defendants' New York offices at which time Mr. Vartabedian introduced Ms. Szafranski to individuals at the ARS trading desk.  During that visit there were discussions concerning problems in the mortgage-backed securities market but Mr. Vartabedian did not disclose any problems that would affect the liquidity or safety of Plaintiffs' investment in the ARS market.  Defendants were aware of substandard market problems that were affecting the liquidity and safety of ARS, but failed to disclose those problems to Plaintiffs.

49.     As Defendants increased their own inventory of ARS, they also increased their need to sell that inventory to investors who were unaware of the risks and

Defendants' manipulations.    Thus, between the Fall of 2007 and February 2008, Defendants continued to aggressively market ARS and continued to misrepresent to investors that ARS were safe, highly liquid, alternatives to cash.

50.    In his daily calls with Plaintiffs' cash management personnel, Vartabedian never disclosed to Plaintiffs that ARS markets were being artificially supported and were on the verge of collapse.    Instead, he continued to advise them, on a daily basis, to continue to trade in ARS.

51.    Defendants' aggressive marketing of ARS included improperly influencing Defendants' own supposedly independent Research Department to help create a false impression of a liquid and secure ARS market so that Defendants could boost sales of ARS thereby reducing their own inventory and exposure to securities they knew to be increasingly risky before the true state of the market became known to investors such as Plaintiffs.

52.    As part of that wrongful conduct, between the Fall of 2007 and February 2008, Defendants permitted their employees who sold ARS to unduly influence and pressure the supposedly independent Research Department by directly requesting and advocating for written research to be published endorsing the safety of high quality of ARS and recommending investors buy ARS.

53.    When Defendants' ARS sales employees did not agree with the tone or content of a published research report, they pressured the Research Department to retract and replace the report with more a sales-friendly content and endorsement of ARS.

54.    Demonstrating their subservience to the ARS sales employees, Defendants' Research Department employees even sought to have the ARS sales

employees review their reports before they were published to make sure they comported with the sales employees' artificial characterization of the ARS market.

55.    Defendants' sales employees went so far as to try and halt a Research Department's answer to an investor's question on a conference call on August 15, 2007, by emailing a Research Department colleague to "Shut this guy down.  Suggest he call outside this call.  He is focusing attention away from your positive message."

56.    Defendants also allowed their ARS sales employees to provide to the Research Department confidential information about inventory levels, marketing initiations and enhanced sales incentives available to sales employees in an effort to gain their help in selling Defendants' inventory of ARS to customers like Plaintiffs.

57.    Defendants' sales employees even had the ability to influence the year-end evaluations and amount of compensation the Research Department employees received by submitting reports describing how helpful they were in assisting in the sales of ARS.

58.    Defendants' Research Department participated directly in the ARS sales effort including by providing information to sales staff about ARS markets to be used in sales and downplayed negative information affecting the liquidity in the ARS markets.

59.    Defendants engaged in the improper influence of their Research Department despite the fact that in 2003 they entered into a $200 million settlement with the Securities and Exchange Commission and state regulators that enjoined them from the very same behavior alleged above and from interfering with the independence of their Research Department.

60.    At least by the Fall of 2007, Defendants knew that the ARS markets were being artificially supported and were likely to collapse. One of Defendants' executives explained in a November 19, 2007 e-mail:

> "Market is collapsing. No more $2K dinners a CRU!! The
> financials are being invicerated! (sic) More firings over at Citi . . .
> Inventory flooding the street. Going to be a great '08 trading
> environment."

61.    As Defendants' ARS inventory continued to grow, they increasingly sought to protect their own interests over the interests of issuers and customers like Plaintiffs. In a November 26, 2007 e-mail relating to continued investor selling and the difficulty of pricing inventory to sell, Defendants' executive said:

> "The gloves are off and we are not concerned about issuer
> perception of [Defendants'] abilities and the competition. Gotta
> Move these microwave ovens!!"

62.    Indeed as late as February 8, 2008, Defendants were still marketing the benefits of the ARS markets, declaring in their Auction Market Value Sheet entitled *Back To Basics In The Auction Market* that "we continue to be impressed by the auction market's resiliency in the face of challenging times. We recommend that investors focus on what made the auction market great to begin with, *conservative and understandable credits and traditional product structure*." (emphasis added).

63.    Plaintiffs, including Jan Hjalber, the Treasurer of Dow Corning, specifically relied on Defendants' research reports concerning securities and markets in which Plaintiffs were invested, such as ARS.

64.    Throughout 2007 and through February 13, 2008 Plaintiffs relied upon the information provided by Defendants' Research Department as being truthful, accurate and unbiased and Plaintiffs were completely unaware of Defendants' improper manipulation

of the Research Department's reports to create a false impression as to the state of the ARS market.

## ARS Market Failure

65.    On February 13, 2008, Defendants stopped supporting ARS auctions. This caused widespread auction failures.    As a result, thousands of Defendants' customers, including Plaintiffs, were left holding illiquid securities.

66.    Following the collapse of the ARS market, the Securities and Exchange Commission and several state regulators opened investigations into Defendants' marketing of ARS.    On August 22, 2008, Defendants, the SEC and the New York Attorney General announced a settlement of the investigation by the SEC and the New York Attorney General's office.    The settlement provides, among other things:

- Defendants will be permanently enjoined from violating the provisions of Section 15(c) of the Exchange Act, and Rule 15c1-2 thereunder, which prohibit the use of manipulative or deceptive devices by broker-dealers.

- Defendants will liquidate at par all ARS from its retail customers, which include all natural persons, charities, and small businesses, no later than January 2010.

- Defendants will make whole any losses sustained by non-institutional customers who purchased ARS before February 12, 2008, and sold such securities after that date at a loss.

- Defendants will use their best efforts to liquidate ARS from their institutional customers by the end of 2009.

- Until Defendants actually provide for the liquidation of the securities, they will provide no-cost loans to non-institutional customers that will remain outstanding until the ARS are repurchased, and will reimburse customers for any interest costs incurred under any prior loan programs the firm provided to its ARS customers.

- Defendants will not liquidate their own inventory of a particular ARS before they liquidate their investors' holdings in that security.

- Defendants face the prospect of a financial penalty to the SEC after they have completed their obligations under the settlement agreement. Determinations as to the amount of the penalty, if any, will take into account, among other things, an assessment of whether Defendants have satisfactorily completed their obligations under the settlement, and the costs incurred by Defendants in meeting those obligations, including penalties incurred and the cost of remediation.

67.    The Defendants also agreed to pay a $150 million civil penalty.

**No Safe Harbor**

68.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.

69.    The statements pleaded herein were not identified as "forward-looking statements" when made.

70.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

71.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants knew or should have known that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a director or an executive officer of Defendants who knew that those statements were false when made.

**Loss Causation/Economic Loss**

72.     Defendants engaged in a fraudulent scheme and course of conduct to manipulate for their own benefit an artificial market for ARS to inflate the perceived value of ARS and to generate underwriting fees and auction management fees to the detriment of investors including Plaintiffs.

73.     Defendants conduct operated as a fraud by, among other things, sending a false pricing signal to the ARS market, creating a false impression of the supply and demand for ARS, and omitting to disclose material foreseeable risks concerning the market for ARS and the value, safety and liquidity risk of those investments.

74.     Most particularly, from the Fall of 2007 until February 13, 2008, Defendants concealed the fact that the ARS markets were on the verge of collapse, and, knowing this information, induced Plaintiffs to continue to bid on ARS until the market collapsed on February 13, 2008.

75.     In his daily calls with Plaintiffs' cash management personnel, Vartabedian never disclosed to Plaintiffs that the ARS markets were being artificially supported and were on the verge of collapse.  Instead, on a daily basis he continued to advise them to trade in ARS.

76.     The materialization of the risks concealed by Defendants was foreseeable to Defendants.

77.     Those risks materialized when Defendants refused to continue to support the ARS auctions and the ARS auction market collapsed.

78.     Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages sustained by Plaintiffs.

## COUNT I

### (Violations Of Section 10(b) Of The Exchange Act and Rule 10b-5)

79.    Plaintiffs restate and reallege the foregoing allegations as if set forth fully herein.

80.    Defendants intentionally and/or recklessly made materially false statements and/or omissions with respect to ARS.   Such statements and/or omissions included, among other things: (i) making false statements that Defendant- brokered ARS were safe and liquid investments and suitable to Plaintiffs' investment objectives; (ii) making false statements with respect to the nature of, and risks associated with, ARS; (iii) making false statements about the liquidity of ARS; (iv) failing to disclose that the market for ARS would collapse if Defendants and other broker-dealers stopped submitting supporting bids and buying ARS for their own inventories; (v) failing to disclose their own significant financial interest in inducing Plaintiffs to purchase ARS; and (vi) failing to disclose that Defendants had increased purchases of ARS for their own inventories to prevent auction failures and to conceal the loss of liquidity for ARS.

81.    Defendants engaged in these misleading practices because they needed customers like Plaintiffs to continue to purchase and invest in ARS.   Without customers like Plaintiffs, the market for ARS would collapse, which would cause Defendants to lose fees from underwriting and managing ARS and would reveal to Defendants' clients, to regulators, and to the investing public the risks that Defendants' had consistently omitted to state and misrepresented up to the very moment of the ARS market's complete collapse.

82.    Plaintiffs reasonably relied upon Defendants' misrepresentations and were deceived by Defendants' omissions to disclose material facts in connection with Plaintiffs' purchases of ARS

83.    Plaintiffs have suffered damages as a consequence of Defendants' unlawful conduct.

## COUNT II

### (Common Law Fraud)

84.    Plaintiffs restate and reallege the foregoing allegations as if fully set forth herein.

85.    Defendants made misrepresentations and omitted to state material facts to Plaintiffs concerning their ARS investments with knowledge that those representations and omissions would be justifiably relied upon by Plaintiffs in connection with their purchase of ARS.

86.    Specifically, Defendants knew or should have known that their material statements and omissions concerning the liquidity and risk of ARS and ARS auction markets were false.  Defendants knew or should have known that ARS were not safe, highly-liquid investments that were alternatives to cash because the Defendants and other broker dealers artificially supported the ARS market.  Defendants knew or should have known and omitted to state that the ARS market was likely to collapse if Defendants or other broker-dealers ceased their artificial support of the market.  These and the other material facts and omissions described above in the Complaint were misrepresented to Plaintiffs.

87.    Defendants' material misstatements and omissions concerning ARS were made fraudulently with the intention of inducing Plaintiffs to purchase such securities.

88.    Plaintiffs reasonably and justifiably relied on Defendants' material misrepresentations and omissions which directly and proximately caused Plaintiffs to suffer damages.

## COUNT III

### (Violation of Michigan Uniform Securities Act M.C.L.A. § 451.810(a)(2)

89.    Plaintiffs restate and reallege the foregoing allegations as if fully set forth herein.

90.    In connection with Plaintiffs' investment in ARS, Defendants made the false statements and omissions to Plaintiffs as set forth in this Complaint.

91.    Each of the false statements and omissions were material to Plaintiffs' decisions to invest in the ARS.

92.    Plaintiffs, at the time of the statements, did not know of the false and misleading nature of those statements or omissions, and believed them to be true.

93.    In reliance upon the statements and omissions and unaware of the truth, Plaintiffs were induced to and did purchase the ARS and were damaged thereby.

## COUNT IV

### (Breach of Fiduciary Duty)

94.    Plaintiffs restate and reallege the foregoing allegations as if fully set forth herein.

95.    The relationship existing between Plaintiffs and Defendants prior to Plaintiffs' purchases of ARS from Defendants was fiduciary in nature, founded on the

trust and confidence reposed by Plaintiffs in the integrity and fidelity of Defendants and Defendants' offers to invest in ARS.

96.    Because Defendants possessed superior knowledge, skill, judgment and expertise in the ARS market, Plaintiffs relied upon the recommendations and representations of Defendants with respect to ARS.

97.    The relationship between the parties created a duty on the part of Defendants to act honestly, fairly and in Plaintiffs' best interests when providing advice concerning ARS. Defendants also had a duty not to supply false, misleading, inaccurate or incomplete information with respect to the ARS purchased by Plaintiffs.

98.    Defendants had a pecuniary interest in offering to sell and in selling the ARS and were obliged to exercise reasonable care or competence in obtaining information, communicating information and providing guidance with respect to the ARS and the ARS market to Plaintiffs for the benefit and guidance of Plaintiffs.

99.    Defendants breached this duty by misrepresenting to Plaintiffs material facts, including that ARS were safe, highly liquid investments that were equivalent to cash, and omitted to state that ARS market was artificially supported and was likely to collapse. Defendants also misrepresented to Plaintiffs that the ARS being sold to Plaintiffs were suitable to Plaintiffs' investment objectives.

100.    As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiffs have suffered damages.

## COUNT V

### (Negligent Misrepresentation and Omissions)

101.    Plaintiffs restate and reallege the foregoing allegations as if fully set forth herein.

102.    In offering to sell and in selling ARS to Plaintiffs, Defendants had a duty not to supply false, misleading, inaccurate or incomplete information with respect to ARS purchased by Plaintiffs.

103.    Defendants had a pecuniary interest in offering to sell and selling the ARS and were obligated to exercise reasonable care or competence in obtaining information, communicating information and providing guidance with respect to the ARS and the ARS market to Plaintiffs for the benefit and guidance of Plaintiffs.

104.    Defendants negligently misrepresented to Plaintiffs that ARS were safe, highly liquid investments that were equivalent to cash, and negligently omitted to state that ARS market was artificially supported and was likely to collapse.  Defendants also negligently misrepresented to Plaintiffs that the ARS being sold to Plaintiffs were suitable to Plaintiffs' investment objectives.

105.    Defendants knew or should have known that Plaintiffs would rely upon statements or omissions made by it negligently with respect to ARS and the ARS market.

106.    As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiffs have suffered damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court issue an order:

A.      Rescinding the investment agreement with Defendants and requiring Defendants to return the funds that Plaintiffs entrusted to Defendants;

B.      Ordering disgorgement of all profits earned by Defendants through the purchase and sale of ARS on behalf of Plaintiffs;

C.      Awarding compensatory and punitive damages;

D.      Awarding pre- and post-judgment interest;

E.      Awarding attorneys' fees and costs incurred in prosecuting this action, and;

F.      Awarding any other remedies that the Court deems appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

Dated: November 19, 2009                    Respectfully submitted,

                                            **BOIES, SCHILLER & FLEXNER LLP**

                                            George F. Carpinello (GFC-4229)
                                            Adam R. Shaw (ARS-2671)
                                            10 North Pearl Street, 4th Floor
                                            Albany, New York  12207
                                            (518) 434-0600

                                            Attorneys for Plaintiffs
                                            Dow Corning Corporation,
                                            Hemlock Semiconductor Corporation and
                                            Devonshire Underwriters Limited

22